# **EXHIBIT L**

# FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT** (this "Agreement"), effective as of the 14th day of December, 2022 (the "Effective Date"), by and among **CV LANTERN PROPERTIES, LLC**, **MADISON LANTERN PROPERTIES, LLC**, and **SAYBROOK LANTERN PROPERTIES, LLC**, each an Ohio limited liability company, **ORCUS SYSTEMS AND SOLUTIONS, INC., LANTERN OF SAYBROOK, INC**, and **LANTERN OF CHAGRIN VALLEY, INC**, each an Ohio corporation (each of the foregoing six entities individually, a "Borrower" and collectively, "Borrowers"), **NESIAN JEAN MAKESH**, an individual resident of the State of Ohio ("Makesh"), **JEAN NESIAN**, an individual resident of the State of Ohio ("Nesian"), **LANTERN HOLDINGS, LLC**, an Ohio limited liability company ("Holdings"), **LANTERN MANAGEMENT, LLC**, an Ohio limited liability company ("Management"; together with Makesh, Nesian and Holdings, each a "Guarantor" and collectively, "Guarantors"), **OXFORD FINANCE LLC**, a Delaware limited liability company, as Agent for the Lender (in such capacity, "Agent") and **OXFORD FINANCE LLC**, a Delaware limited liability company, as Lender ("Lender").

### R E C I T A L S:

A.   Borrowers, Agent and Lender entered into that certain Term Loan and Security Agreement dated as of May 6, 2021 (the "Original Loan Agreement"), as amended by that certain Waiver and Amendment to Term Loan and Security Agreement dated as of May 2, 2022 (the "First Amendment"; the Original Loan Agreement, as amended by the First Amendment, is referred to herein as the "Loan Agreement").  *Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given to them in the Loan Agreement.*

B.   In various reservation of rights letters (the "ROR Letters"), Agent and Lender have previously given Borrowers notice of the existing and uncured Events of Default described on Exhibit A attached hereto (the "Specified Events of Default").

C.   Pursuant to that certain Notice of Default, Reservation of Rights and Acceleration of the Obligations dated as of November 9, 2022 (the "Acceleration Notice"), Agent and Lender declared the Term Loan and all other Obligations immediately due and payable pursuant to Section 12.2 of the Loan Agreement (the "Acceleration").

D.   In the ROR Letters and the Acceleration Notice, Agent and Lender reserved all rights and remedies with respect to the Specified Events of Default and the Acceleration.

E.   Borrowers have requested that Lender and Agent agree to temporarily forbear from the enforcement of Lender's and Agent's rights and remedies as a result of the Specified Events of Default and the Acceleration, and Lender and Agent are willing to grant the requested forbearance, but only upon the terms and conditions hereinafter provided.

# AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing Recitals and other good and valuable consideration, the parties hereto agree as follows:

1. <u>Recitals</u>.  The Recitals hereinabove are true and correct.

2. <u>Specified Events of Default</u>.  As set forth above, the Specified Events of Default exist and remain uncured, and notwithstanding the Acceleration, the Term Loan and the Obligations remain unpaid.  Borrowers acknowledge that Lender and Agent have not waived the Specified Events of Default or the Acceleration or any of their rights or remedies with respect thereto.  Furthermore, this Agreement shall not constitute (i) a waiver by Lender or Agent of any Event of Default, whether now known or unknown to Lender and Agent and whether now or hereafter existing, or the Acceleration, or (ii) except as expressly set forth in Section 3 of this Agreement with respect to the Specified Events of Default and the Acceleration, an agreement to forbear the exercise of rights and remedies by Lender or Agent under or with respect to the Loan Documents and the Obligations.

3. <u>Forbearance Period</u>. Notwithstanding the Specified Events of Default and the Acceleration, but subject to the other terms and conditions set forth in this Agreement, commencing on the Effective Date and continuing until the occurrence of the Forbearance Termination Date (as hereafter defined) (the "<u>Forbearance Period</u>"), Lender and Agent agree that they shall not (a) take any action to repossess, foreclose upon, sell, or control any Collateral as a result of the Specified Events of Default and the Acceleration, or (b) take any actions or file any proceedings, whether under the Loan Documents, at law or in equity, to enforce any of Lender's and Agent's rights and remedies with respect to the foregoing documents or against any Collateral as a result of any Specified Event of Default and the Acceleration (the foregoing covenant being hereinafter referred to as the "<u>Forbearance</u>").  Immediately upon the occurrence of the Forbearance Termination Date, Lender and Agent shall have the right, at any time, and from time to time, to exercise any and all rights and remedies available against Borrowers, Guarantors and/or the Collateral under the Loan Documents, at law or in equity, to the same extent that Lender and Agent would be entitled if the Forbearance had never been part of this Agreement.

4. <u>Forbearance Termination Date</u>.  As used in this Agreement, the "<u>Forbearance Termination Date</u>" shall be the earlier of (i) the Stated Expiration Date (as hereinafter defined), or (ii) the date on which a Termination Event (as hereinafter defined) occurs. As used herein, the "<u>Stated Expiration Date</u>" shall mean March 15, 2023.  As used herein, "<u>Termination Event</u>" means the occurrence of one or more of the following events:

    (a) The occurrence of any Event of Default (other than (I) the Specified Events of Default and (II) any Event of Default under Section 12.1(e) of the Loan Agreement during the Forbearance Period resulting from Borrowers' breach or violation of any covenant contained in Section 10 of the Loan Agreement) pursuant to any of the Loan Documents;

(b)     The occurrence of any material diminution or decline in the value of the Collateral during the Forbearance Period;

(c)     If any of the acknowledgments, warranties, or representations of the Borrowers set forth in this Agreement shall be untrue or inaccurate in any material respect; or

(d)     If Borrowers shall breach, default, or fail to perform or observe any of the obligations, agreements, or undertakings contained in this Agreement, including, without limitation, any of the Forbearance Covenants (as hereinafter defined).

5.     <u>Forbearance Covenants</u>.  In consideration for the Forbearance, Borrowers agree to comply with each of the following covenants (the "<u>Forbearance Covenants</u>"):

(a)     Borrowers shall in good faith pursue a fully executed term sheet from a bona fide institutional lender to refinance in full the Term Loan and all related Obligations ("<u>Full Satisfaction</u>") on or before March 15, 2023, subject only to customary conditions to closing;

(b)     On December 15, 2022, January 15, 2023 and February 15, 2023, Borrowers shall deposit $250,000 into the Cash Collateral Reserve (as defined in the First Amendment); and

(c)     Notwithstanding anything to the contrary stated in the Loan Documents, Borrowers agree to maintain a minimum daily average patient census at the Healthcare Facilities of not less than (i) 134 for the month of December, 2022, (ii) 136 for the month of January, 2023 and (iii) 138 for the month of February, 2023.  Borrowers further agree that within five (5) Business Days after the end of each calendar month, Borrowers shall furnish to Agent a report for the month just ended as to the patient census of each Healthcare Facility.  Each such report shall also include a calculation of the average daily patient census for all Healthcare Facilities for such month then ended, all in form and substance reasonably acceptable to Agent.

6.     <u>Acceleration and Default Rate of Interest</u>.  Borrowers and Guarantors hereby acknowledge and agree that Agent and Lender have accelerated the Obligations and that all of the Obligations are currently due and payable, subject to the Forbearance set forth herein.  Borrowers and Guarantors hereby further acknowledge and agree that Agent and Lender have elected to charge interest at the Default Rate of Interest on the outstanding principal balance of the Term Loan (and other Obligations owing and unpaid from time to time) pursuant to Section 6.2 of the Loan Agreement, retroactive to the occurrence of the first Specified Event of Default on June 1, 2022, even though Borrowers have only paid interest on the Obligations at the Interest Rate (which equals the LIBOR Rate plus 6.15% per annum) since June 1, 2022.  Agent and Lenders agree with Borrowers, as further consideration to Borrowers by Agent and Lenders in connection herewith, and notwithstanding anything to the contrary in the Loan Agreement, (a) on the first day of each calendar month during the Forbearance Period and on the date the Term Loan and other Obligations are paid in full during the Forbearance Period, Borrowers shall pay, in cash, all accrued and unpaid interest on the outstanding principal balance of the Term Loan

calculated at the Interest Rate in accordance with the Loan Agreement, and (b) in addition to such cash interest payments, additional interest shall accrue at the Default Rate Margin (as hereinafter defined) on the outstanding principal balance of the Term Loan (and other Obligations owing and unpaid from time to time) from and after June 1, 2022 (collectively, the "Accrued Default Rate Margin Amount"); provided, however, that if the Term Loan and all other Obligations are paid in full in cash on or prior to Forbearance Termination Date, Agent and Lender agree to waive the payment of the then Accrued Default Rate Margin Amount. As used herein, the Default Rate Margin means the five percent (5.0%) per annum difference between the Default Rate of Interest and the Interest Rate. However, if the Term Loan and all other Obligations are not paid in full in cash on or prior to Forbearance Termination Date, then (x) all then Accrued Default Rate Margin Amount shall become immediately due and payable on the Forbearance Termination Date, and (b) interest on the outstanding principal balance of the Term Loan (and other Obligations owing and unpaid from time to time) shall continue to bear interest at the Default Rate of Interest and be payable in cash on the first day of each calendar month thereafter and on the date the Term Loan and all other Obligations are paid in full in cash.

7. **Agent and Lender Update**. Upon the request of Agent and Lender, but in all events not less than once per week, senior management of Borrowers will participate in meetings or conference calls with Agent and Lender and their representatives and consultants, at such dates and times to be provided by Agent and Lender upon reasonable notice, and will cause other advisors of Borrowers, as applicable or as requested by Agent and Lender, to participate in such calls and/or meetings for the purpose of discussing the status of the financial, collateral, and operational condition, businesses, liabilities, assets, and prospects of Borrowers and the Healthcare Facilities, any sale, refinance or other strategic transaction efforts. Borrowers and Guarantors shall promptly provide copies of all non-privileged non-confidential written materials provided to, or produced by, Borrowers or Guarantors in connection with any sale, refinance, other strategic transaction efforts (including, without limitation, any letters of intent, confidentiality agreements, draft purchase documents, commitment letters, and correspondence to or from any Government Authority) and material third party reports relating to the financial, collateral, or operational performance of Borrowers and the Healthcare Facilities or any other non-privileged non-confidential written material as Agent and/or Lender may reasonably request from time to time. Without limiting the foregoing, Borrowers agree to notify Agent and Lender immediately upon any Borrower becoming aware of any material change or development relating to any sale or refinance efforts or to the financial, collateral, or operational condition, businesses, assets, liabilities, or prospects of Borrowers or the Healthcare Facilities. The terms of this Section 7 shall continue to apply from and after the date hereof (notwithstanding the expiration or earlier termination of the Forbearance Period).

8. **Maturity Date**. As set forth in the Acceleration Notice, Agent and Lender have accelerated the Term Loan and the other Obligations, and all of the Obligations are currently due and payable, subject to the Forbearance set forth herein. For the sake of clarity, as a result of the acceleration of the Obligations, the Maturity Date is November 9, 2022, and Borrowers have no extension options under the Loan Agreement.

9. **Prepayment Premium**. Notwithstanding anything to the contrary stated in the Loan Documents, Agent and Lender hereby agree that no Prepayment Premium shall be due

pursuant to the terms of Section 6.5 of the Loan Agreement if the Full Satisfaction occurs during the Forbearance Period.

10. <u>No Further Forbearance Committed</u>.  Borrowers acknowledge this Agreement does not contain any commitment or promise that Lender and Agent will offer or approve an extension of the Forbearance Period beyond the Stated Expiration Date and Borrowers acknowledge that Lender and Agent have not otherwise made any commitment or promise, in writing or otherwise, to Borrowers with respect to any future extension of the Stated Expiration Date.

11. <u>Reaffirmation of Obligations</u>. Notwithstanding anything to the contrary in this Agreement, no action of Lender or Agent under this Agreement or otherwise shall act to release Borrowers from any of the Obligations, and all of said Obligations are hereby ratified and affirmed the same as if repeated on this date, and the Borrowers acknowledge that they have no legal or equitable defenses or offsets with respect to the Obligations.  The Borrowers ratify and confirm all terms and conditions of the Loan Documents, and acknowledge that the same are in full force and effect and constitute the legal, valid and binding obligations of Borrowers enforceable against Borrowers in accordance with their respective terms.  This Agreement shall constitute a Loan Document.

12. <u>Due Authorization, Execution and Delivery</u>.  Borrowers represent and warrant that this Agreement has been duly authorized, executed and delivered by Borrowers.

13. <u>Consent of Guarantors</u>.  Guarantors join in the execution of this Agreement to acknowledge their consent to the terms hereof and to acknowledge that the Guaranty Agreement (collectively, as amended and with any and all other loan documentation at any time executed by Guarantor in connection with the Term Loan, the "<u>Guaranty Documents</u>") remain in full force and effect and the Guaranty Documents are hereby ratified and affirmed in all respects by Guarantors.  Guarantors confirm that they have no defenses or setoffs with respect to any of their obligations under any of the Guaranty Documents.

14. <u>Negotiations</u>.  There may have been certain negotiations and discussions between the Lender, Agent and Borrowers leading up to this Agreement and the parties hereto may hereafter enter into certain negotiations and discussions regarding the modification, amendment, restructure, extension, and/or renewal of this Agreement, the Term Loan and/or Loan Documents or in compromise and settlement of the Obligations.  Borrowers understand and agree that all such requests for modification, amendment, restructure, extension, or renewal of the Term Loan and/or Loan Documents or the restructure, compromise or settlement of the Obligations must be submitted in writing by Borrowers and must be approved and accepted in writing by an authorized officer of Agent.  No representation, offer, discussion, concession, or statement made by any party during the course of discussions and negotiations shall constitute a waiver or relinquishment by any party of any rights, remedies, claims, or defenses that party may have or in any way amend, extend, review, modify or terminate the Loan Documents or any rights thereunder or modify the legal relationship of the parties or result in an admission against interest of any party except to the extent that the applicable parties agree in a duly executed and binding written agreement duly signed by such parties.  Any correspondence, comments, statements, commitments, or agreements made in the course of the discussions anticipated by this Agreement

are tentative and preliminary only and shall not be binding on any party unless and until reduced to writing and duly signed by any applicable party. All correspondence, discussions, offers, concessions, and statements shall be deemed to be a discussion in the nature of settlement as defined by Rule 408 of the Federal Rules of Evidence and Rule 408 of the Rules of Evidence which no party shall have the right to use in connection with the exercise of any right, remedy, claim, or defense of the Loan Documents or in any action at law or in equity relating thereto and no statement (oral or otherwise) made by any party to the others in the course of discussion shall be admissible in any proceeding at law or in equity involving the Term Loan or Loan Documents or be deemed an admission of fact or evidence.

15. <u>Adequate Consideration</u>. Borrowers acknowledge and agree that the Forbearance and agreements herein granted by Lender and Agent constitute full and adequate consideration for execution and delivery of this Agreement.

16. <u>Bankruptcy Provisions</u>. As a material inducement for Lender and Agent to enter into this Agreement, and in recognition and consideration of Lender's and Agent's execution and performance of this Agreement, including Lender's and Agent's agreement to forbear from exercising their rights and remedies, Borrowers hereby stipulate and agree that if a voluntary or involuntary bankruptcy proceeding is filed by or against any of them (in such event, such parties being referred to individually and collectively as the "**Debtors**") under the Bankruptcy Code or any receivership or other insolvency law, then in such event(s):

(a) <u>Waiver of the Automatic Stay</u>. Lender and Agent shall be entitled to relief from any automatic stay imposed by Sections 105 or 362 of the Bankruptcy Code, or any other statute otherwise, in order that Lender or Agent may immediately exercise their rights and remedies as provided in the Loan Documents or under applicable law, and Debtors hereby waive and release the benefit of such automatic stay and covenant and agree to raise no objection to such relief, nor shall Debtors seek a supplemental stay or any similar relief, whether injunctive or otherwise, and Debtors shall not request any other party to assert any objection to Lender's or Agent's relief from the automatic stay. In furtherance and support of the foregoing waivers, Debtors expressly stipulate, acknowledge and agree that, but for the execution of this Agreement, no legal or equitable grounds exist that would bar, delay or impede Lender's or Agent's immediate exercise of its rights and remedies under the Loan Documents.

(b) <u>Adequate Protection</u>. In the event Lender and Agent are prohibited by the automatic stay at 11 U.S.C. § 362 or otherwise from exercising any rights and remedies, then as the <u>minimum</u> adequate protection required to be provided to Lender and Agent under the Bankruptcy Code for the Debtors' continued use or possession of such property or cash collateral, Lender and Agent shall be entitled to the following: (a) monthly cash payments beginning from the commencement of Debtors' bankruptcy case(s) in an amount equal to not less than the monthly interest payment owed under the Term Loan plus any remaining amounts available after payment of operating expenses, plus (b) post-petition replacement liens on all of the Debtors' property of the same type and nature as the collateral, plus, (c) administrative expense priority claims to the extent the foregoing adequate protection proves inadequate.

17. <u>Full Knowledge</u>. It is acknowledged that the Borrowers have read this Agreement and consulted counsel (or had the opportunity to consult with counsel) before executing this

Agreement; that the Borrowers have relied upon their own judgment and that of their counsel in executing same and have not relied on or been induced by any representation, statement or act by any other party referenced to herein which is not referred to in this Agreement; and that the Borrowers enter into this Agreement voluntarily, with full knowledge of its significance.

18. Construction. Each party acknowledges that it has participated in the negotiation of this Agreement and no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured, dictated or drafted such provision. All terms of this Agreement were negotiated at arms-length, and this Agreement was prepared and executed without fraud, duress, undue influence or coercion of any kind exerted by any of the parties upon the other. The execution and delivery of this Agreement is the free and voluntary act of the parties.

19. Invalid Provision to Affect No Others. If, from any circumstances whatsoever, fulfillment of any provision of this Agreement shall involve transcending the limit of validity presently prescribed by any applicable law, with regard to obligations of like character and amount, then ipso facto the obligation to be fulfilled shall be reduced to the limit of such validity. Further, if any cause or provision herein contained operates or would prospectively operate to invalidate this Agreement, in whole or in part, then such clause or provision only shall be held for naught, as though not herein contained, and the remainder of this Agreement shall remain operative and in full force and effect.

20. Counterparts; Electronic Delivery. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties thereto. Any signature to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages. Delivery of an executed counterpart of this Agreement by telecopier or any other form of electronic transmission shall be equally as effective as delivery of an original executed counterpart thereof. Any party delivering an executed counterpart of this Agreement by telecopier or other electronic means also shall deliver an original executed counterpart of such instrument, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect thereof.

21. Modifications. This Agreement cannot be changed or terminated orally, is for the benefit of the parties hereto and their respective successors and assigns, and is binding upon the parties hereto in accordance with its terms.

22. Successors and Assigns; No Third Party Beneficiaries. This Agreement shall bind and inure to the benefit of the parties hereto, including their respective successors and assigns. However, no other person shall have any rights hereunder or be entitled to rely on this Agreement and all third party beneficiary rights are hereby disclaimed.

23. <u>Time is of the Essence</u>.  Time is of the essence in the performance of this Agreement.

24. <u>Governing Law: Consent to Jurisdiction and Venue</u>.  THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CONFLICTS EXCEPT TO THE EXTENT THAT ANY OTHER LOAN DOCUMENT INCLUDES AN EXPRESS ELECTION TO BE GOVERNED BY THE LAWS OF ANOTHER JURISDICTION.  BORROWERS AND AGENT EACH HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK, NEW YORK AND IRREVOCABLY AGREES THAT, SUBJECT TO AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS.

25. **<u>Release</u>.  BORROWERS AND GUARANTORS HEREBY FULLY AND FOREVER RELEASE, ACQUIT AND DISCHARGE AGENT, LENDER, AND THEIR RESPECTIVE AFFILIATES, SUBSIDIARIES, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, SERVANTS, REPRESENTATIVES, AGENTS, ATTORNEYS OR OTHER PERSONS ACTING ON BEHALF OF ANY OF THE FOREGOING, AND THE HEIRS, REPRESENTATIVES, SUCCESSORS AND ASSIGNEES OF EACH OF THEM FROM ANY AND ALL LIABILITY ON ACCOUNT OF ANY AND ALL CLAIMS, DEMANDS, ACTIONS OR CAUSES OF ACTION WHETHER IN LAW OR IN EQUITY OR OTHERWISE, WHETHER IN CONTRACT OR TORT OR PURSUANT TO ANY STATUTE, CODE, ORDINANCE OR REGULATIONS, INCLUDING THAT CAUSE OF ACTION POPULARLY KNOWN AS "LENDER LIABILITY," WHETHER DIRECT OR INDIRECT, WHETHER KNOWN OR UNKNOWN, WHETHER PRESENTLY DISCOVERABLE, WHETHER SUSPECTED, UNCLAIMED OR CLAIMED WHICH BORROWERS OR GUARANTORS EVER HAS, NOW HAS OR MAY HAVE AGAINST AGENT OR LENDER ARISING OUT OF OR IN ANY WAY RELATED TO LOAN TRANSACTIONS WITH AGENT AND LENDER, LOAN REQUESTS TO AGENT OR LENDER, ANY LOAN DOCUMENTATION, THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT OR RELATIONSHIPS OR TRANSACTIONS OF ANY KIND OR NATURE INVOLVING AGENT, LENDER, BORROWERS AND/OR GUARANTORS. BORROWERS AND GUARANTORS REPRESENT, WARRANT AND ACKNOWLEDGE THAT ADEQUATE, SUFFICIENT, GOOD AND VALUABLE CONSIDERATION, IN THE FORM OF AGENT'S AND LENDER'S EXECUTION OF THIS AGREEMENT FOR THE MODIFICATION OF THE TERM LOAN AND WAIVER OF EVENTS OF DEFAULT, HAS BEEN RECEIVED FROM AGENT AND LENDER FOR THIS RELEASE.  THIS PARAGRAPH IS PRINTED IN BOLD FACE TYPE TO SIGNIFY ITS IMPORTANCE TO AGENT AND LENDER AS MATERIAL CONSIDERATION FOR AGENT'S AND LENDER'S ENTRY INTO THIS AGREEMENT.**

26. <u>Jury Waiver</u>.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWERS AND GUARANTORS HEREBY WAIVE ANY RIGHT TO TRIAL BY

**JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT, THE LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENTS, OR (ii) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT, THE LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENTS OR IN CONNECTION WITH THE TRANSACTIONS RELATED THERETO OR CONTEMPLATED THEREBY OR THE EXERCISE OF THE PARTIES' RIGHTS AND REMEDIES THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.  BORROWERS AND GUARANTORS AGREE THAT AGENT OR LENDER MAY FILE A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT OF BORROWERS AND GUARANTORS IRREVOCABLY TO WAIVE THEIR RIGHT TO TRIAL BY JURY, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN AGENT, LENDER AND BORROWERS AND/OR GUARANTORS SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.**

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered to be effective as of the Effective Date.

**BORROWERS:**

CV LANTERN PROPERTIES, LLC, an Ohio limited liability company

By: _____
Name: Nesian Jean Makesh
Title:  Manager

MADISON LANTERN PROPERTIES, LLC, an Ohio limited liability company

By: _____
Name: Nesian Jean Makesh
Title:  Manager

SAYBROOK LANTERN PROPERTIES, LLC, an Ohio limited liability company

By: _____
Name: Nesian Jean Makesh
Title:  Manager

ORCUS SYSTEMS AND SOLUTIONS, INC., an Ohio corporation

By: _____
Name: Nesian Jean Makesh
Title:  President

LANTERN OF SAYBROOK, INC, an Ohio corporation

By: _____
Name: Nesian Jean Makesh
Title:  President

LANTERN OF CHAGRIN VALLEY, INC, an Ohio corporation

By: _____
Name: Nesian Jean Makesh
Title:  President

**GUARANTORS:**

_____
NESIAN JEAN MAKESH, an individual resident of the State of Ohio

_____
JEAN NESIAN, an individual resident of the State of Ohio

LANTERN HOLDINGS, LLC, an Ohio limited liability company

By: _____
Name: Nesian Jean Makesh
Title: Member

LANTERN MANAGEMENT, LLC, an Ohio limited liability company

By: _____
Name: Nesian Jean Makesh
Title: Member

**AGENT**:

OXFORD FINANCE LLC, a
Delaware limited liability company, as Agent

By: _____
Name: Colette H. Featherly
Title:   Senior Vice President


**LENDER:**

OXFORD FINANCE LLC,
a Delaware limited liability company

By: _____
Name: Colette H. Featherly
Title:   Senior Vice President

# EXHIBIT A

## Specified Events of Default

- An Event of Default under Section 12.1(e) of the Loan Agreement resulting from Borrowers' failure to maintain a minimum daily average patient census at the Healthcare Facilities of not less than 152 for the month of May, 2022.

- An Event of Default under Section 12.1(e) of the Loan Agreement resulting from Borrowers' failure to maintain a minimum daily average patient census at the Healthcare Facilities of not less than 154 for the month of June, 2022.

- An Event of Default under Section 12.1(f) of the Loan Agreement resulting from Borrowers' failure to deposit $150,000 into the Cash Collateral Account on July 1, 2022, as required by Section 3 of the First Amendment.

- An Event of Default under Section 12.1(e) of the Loan Agreement resulting from Borrowers' failure to maintain a minimum daily average patient census at the Healthcare Facilities of not less than 156 for the month of July, 2022.

- An Event of Default under Section 12.1(e) of the Loan Agreement resulting from Borrowers' failure to maintain a Fixed Charge Coverage Ratio of not less than 1.00 to 1.00 for the Test Period measured as of the last day of June 2022.

- An Event of Default under Section 12.1(f) of the Loan Agreement resulting from Borrowers' failure to deposit $150,000 into the Cash Collateral Account on August 1, 2022, as required by Section 3 of the First Amendment.

- An Event of Default under Section 12.1(e) of the Loan Agreement resulting from Borrowers' failure to maintain a minimum daily average patient census at the Healthcare Facilities of not less than 160 for the month of August, 2022.

- An Event of Default under Section 12.1(e) of the Loan Agreement resulting from Borrowers' failure to maintain a minimum daily average patient census at the Healthcare Facilities of not less than 164 for the month of September, 2022.

- An Event of Default under Section 12.1(e) of the Loan Agreement resulting from Borrowers' failure to maintain a minimum daily average patient census at the Healthcare Facilities of not less than 170 for the month of October, 2022.

- An Event of Default under Section 12.1(e) of the Loan Agreement resulting from Borrowers' failure to maintain a Fixed Charge Coverage Ratio of not less than 1.00 to 1.00 for the Test Period measured as of the last day of September 2022.

- An Event of Default under Section 12.1(e) of the Loan Agreement resulting from Borrowers' failure to maintain an Adjusted EBITDAR of not less than $750,000 (annualized) for the Test Period measured as of the last day of September 2022.

- An Event of Default under Section 12.1(f) of the Loan Agreement resulting from Borrowers' failure to deposit $150,000 into the Cash Collateral Account on September 1, 2022, October 1, 2022 and November 1, 2022, as required by Section 3 of the First Amendment.